THE BALTIMORE CONSOLIDATED RAILWAY COMPANY *vs.* STATE OF MARYLAND, USE OF MARGARET O'DEA ET AL.

*Negligence—Lowering of Cable while a Trolley Car is Passing Underneath—Improper Signal to Advance Given by City Employee to Defendant's Motorman—Assumption of Fact in Prayer— When Deposition of Resident Witness Taken de bene esse may be Used at Trial.*

In the construction of certain municipal work the city employees placed a movable derrick on one side of the tracks of defendant's electric street railway, and this derrick was worked by a cable stretched from an engine placed on the other side of the tracks at the intersection of a cross-street. When the cable was tightly stretched the cars could pass under it, but at that time it was the duty of the conductor of the car to lower the trolley-pole so as to avoid contact with the cable. A city watchman was stationed at that point, whose duty it was to signal the cars when it was safe to pass under the cable. This signal was given to one of defendant's cars, which had previously stopped, and thereupon went forward, but after the hood of the car had passed under the cable, the latter was suddenly slackened and lowered and came into contact with the base of the trolley pole, which dragged the cable against the derrick, causing it to fall upon plaintiff's deceased, who was thereby killed. In an action against the railway company to recover damages *Held*,

1st. That the accident was not caused by the negligence of defendant's agents, but by that of the city employees, either in signaling the car to advance when the cable was slack or by allowing it to slacken when it should have been kept taut.

2nd That although it was conceded by a prayer in the case that the conductor ought to have been upon the rear platform, and the plaintiff's evidence (contradicted by that of the defendant,) showed that

he was in the car at the time, yet there is no relation of cause and effect between the position of the conductor and the falling of the derrick, since the failure to lower the trolley pole did not cause the cable to be dragged against the derrick, the cable having been caught by the base of the pole, and, consequently, the position of the conductor was not the negligence causing the injury complained of.

3rd. That defendant's prayers instructing the jury that defendant was not responsible for the negligence of the city's watchman in improperly giving the signal to start, were erroneous, because they assumed that the watchman was an employee of the city instead of leaving it to the jury to find that fact.

Code, Art. 35 sec. 19 provides for the taking of the deposition of a witness, after notice to the opposite party, to be used at the trial, in case of the death of such witness or proof of the inability of the party to procure his attendance at the trial. This provision has relation to resident witnesses and not to the deposition of non-resident witnesses taken under a commission under Code, Art. 35 sec. 15. In this case the deposition of a resident witness was taken under the section first above mentioned. At the first trial this witness was present and testified, but on account of the illness of a juror the case was continued. At the second trial this witness was not present and the deposition so taken was offered in evidence. *Held*, that the deposition is not admissible, since it was taken solely with reference to the first trial and became nullified by the appearance of the witness at that trial and the taking of his evidence orally.

Appeal from the Court of Common Pleas (WRIGHT, J.) The plaintiffs obtained a judgment on verdict for $3,750.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, SCHMUCKER and JONES, JJ.

*Fielder C. Slingluff* and *T. Rowland Slingluff,* for the appellant.

*J. Markham Marshall* and *J. Hanson Thomas* (with whom was *R. E. Lee Marshall* on the brief), for the appellees.

McSHERRY, C. J., delivered the opinion of the Court.

The record now before us contains two bills of exception. One relates to a ruling of the trial Court in admitting a deposition to be read in evidence. The other concerns the action of the Court in rejecting some of the

prayers presented by the defendant. The suit was brought to recover damages. The equitable plaintiffs, who are the widow and children of Michael V. O'Dea, sued the Baltimore Consolidated Railway Company for the injury which they sustained by the death of O'Dea. They allege his death was caused by the negligence of the defendant. There is no dispute about any of the material facts, though there is some controversy over minor and unimportant details. The circumstances which are free from doubt are these : The defendant is a corporation which at the time of the accident, operated a street railway in Baltimore City. The city authorities were then engaged in laying water-mains under the surface of Henrietta street at and near its intersection with Charles street. In prosecuting that work the city employees used a movable derrick which was stationed on the day of the occurrence on Henrietta street *east* of Charles street. This derrick was worked by a steam-engine located on Henrietta street *west* of Charles street. A cable reached from the derrick to the engine and consequently crossed, at a right angle, the defendant's tracks on Charles street. When the cable, extending east and west across Charles street, was tightly stretched it was at an elevation sufficiently high above the car tracks to allow the street cars going south on Charles street to pass under it ; but in passing under it the conductor lowered the trolley-pole so as to prevent the pole from coming in contact with the cable. The cable was slackened or tightened as the exigencies of the work required. The city had a flagman or watchman stationed at the corner of Charles and Henrietta streets, in the vicinity of the derrick, to give warning when it was dangerous to pass under the cable, and to signal the motormen when it was safe to go forward. On the day of the accident a car of the defendant moving south on Charles street approached the place where the cable crossed the track. It stopped, according to the great weight of the testimony, just before reaching Henrietta street to let off a passenger, and before starting again the motor-man was sig-

naled by the city's flagman to proceed. He obeyed the signal. The hood of the car cleared the cable but the base of the trolley-pole caught it and as the car advanced it dragged the derrick over and caused it to fall. It fell on O'Dea and killed him. Whether or not the cable was taut or was slightly slackened when the car started forward is a disputed question; though the undoubted weight of the evidence shows that it was tightly stretched at that moment. If it was slack when it ought to have been tight, and by reason of being slack was dangerous when the car was started, the fault was obviously not that of the railway company, but of the city employees, for it was the duty of the latter to keep it taut and the management of it was exclusively in their hands. If it was slack the city watchman was guilty of negligence in signaling the motor-man to advance, if by advancing when it was slack there was danger of an injury being inflicted. The railway company had the right to run its cars. The running of the one in question was not, therefore, wrongful, nor was it an act of negligence. The possibility of an injury being done by reason of the car coming in contact with the cable, was a possibility which could not become a reality unless there was some negligence on the part of the city, either in not keeping the cable stretched when it ought to have been stretched, or in inducing the company's servants to believe that it was safe to go under it when in fact it was not safe to do so. As it was the duty of the city to keep its appliances in a safe condition and to operate them with care, a failure to do either was the negligence of the city and not the negligence of the company.

It was claimed by the equitable plaintiffs that when the car started to go under the cable the conductor was in the forward part of the car collecting fares, and it is asserted that he should have been upon the rear platform. There is a conflict in the testimony as to his whereabouts. The overwhelming weight of the evidence shows that he was upon the rear platform and that he had the trolley-pole

rope in his hand ; but we must assume, for the purposes of this discussion, that he was not where the defendant's witnesses place him, but that he was in the forward part of the car, as described by two of the plaintiff's witnesses. It was contended that the failure of the conductor to be upon the rear platform was such an act of negligence as to render the company liable for the injury caused by the falling of the derrick ; and the defendant's eighth prayer, which was conceded by the plaintiffs, admits that it was the duty of the conductor to have been on the rear platform. This concession became the law of the case whether right or wrong ; *Rosenstock* v. *Ortwine*, 46 Md. 388 ; but we fail to see any relation of cause and effect between the situation which the conductor occupied and the falling of the derrick. It was his duty to be in the forward part of the car to collect fares if fares were to be collected ; and his being where it was his duty to be was not a breach of a duty that he owed to any one, and was, therefore, not an act of negligence, particularly as it has not been shown that his failure to be on the rear platform, if in fact he was not there, had anything to do with the falling of the derrick. If he had been on the rear platform he could no more have prevented the cable from slackening at the critical moment that it did slacken, than he could have hindered it from doing the same thing whilst he was inside of the car. It is nowhere pretended that his omission to lower the trolley-pole caused the accident, for the cable never came in contact with the pole, but was caught by the base of the pole. If the cable slackened slightly before the car reached it, the conductor's presence on the rear platform would not necessarily have prevented the car from going on; because he had a right to rely on the assurance of the flagman that it was safe to advance. The flagman was stationed at the place for the specific purpose of giving notice when it was safe for cars to go under the cable, and the conductor would have been guilty of no negligence in depending on that notice, unless he saw, or could have seen, that the flagman was in error

and that peril was imminent. But there is no evidence in the record to indicate that had he been on the rear platform he could have seen that there was such peril or that such peril existed. It is not pretended that the cable was so much slackened as to make it doubtful whether the car could safely pass under it; on the contrary it is only claimed that it was slightly slackened. Evidently, after the hood of the car had passed under it, the cable became much looser by reason of some carelessness, or at least, by some act done in the city's engine-room; but neither the company's conductor nor the city's flagman was bound to assume that this would occur, and the failure to assume it and to refrain from acting was obviously not negligence on the part of the company's servants. That there was negligence somewhere is indisputable; but the negligence cannot be attributed to the railway company when the mismanagement, carelessness, or whatever did cause the cable to slacken, is referable not to the company, but solely to the city's employees. Undoubtedly an injury was inflicted, and that injury was caused by negligence, but the plaintiffs have sued the wrong corporation as *tort-feasor*. If the cable had not been slackened just after the hood of the car passed under it, the accident would not have happened. The car had the right to pass under the cable and the city was bound to keep the cable taut so that the car could safely pass under it. Its failure to do this was its negligence, and for that negligence the company was not answerable. The case ought, therefore, to have been taken from the jury, but there was no such request made of the trial Court. The defendant's second, fourth and fifth prayers, by which the Court below was asked to say to the jury that the railway company was not responsible for the negligence of the city's watchman, would have been right had they not assumed that the watchman was the employee of the city, instead of leaving the jury to find that fact. A prayer cannot assume any fact when the *onus* of proving such fact rests upon the party asking the instruction, no

matter how clear his proof may be on the subject.  *Peter-son* v. *Ellicott*, 9 Md. 52.

There was error, however, in the ruling set out in the second bill of exceptions.  The ruling complained of admitted in evidence the deposition of August Becker, and permitted it to be read to the jury.  These are the facts which give rise to the objection.  Upon application the Court permitted the testimony of the witness Becker to be taken under *sec. 19, Art. 35 of the Code.*  By that section it is provided that either party to a cause may, after notice to the opposite party, take the deposition of any witness to be used as testimony on the trial of such cause, "in.case only of the death of such witness, or on proof to the satisfaction of the Court of the inability of the party to procure the attendance of such witness at the time of trial, and the probable continuance of said inability until and at the next term, before the Court shall permit such testimony to be used."  When the case came on for trial the witness Becker was present in Court and gave his testimony orally, and, of course, then the deposition previously taken was not read. But one of the jurors became ill before the trial was concluded, the jury was discharged and the case was continued. At the second trial, during a subsequent term of the Court, the witness Becker was not present, and the deposition, unused on the first trial, was offered in evidence.  Its admissibility was disputed by the defendant.  The objection to its being read was overruled, it was read and the defendant excepted.

It is quite clear that the purpose of the statute embodied in *sec. 19* above referred to, was to procure the testimony of a resident witness if it was made to appear to the satisfaction of the Court that the attendance of the witness could not be secured by the next ensuing term of Court. It was not the design to place such depositions on the same footing with those taken under a commission issued under *sec. 15, Art. 35 of the Code*, to secure the testimony of non-resident witnesses.  Primarily the statute contemplates.

that the resident witness shall appear in person, but as contingencies might occur where this would not be possible, the Legislature provided by *sec. 19* for the production of his testimony by deposition if the personal attendance of the witness could not be procured in a reasonable time. The deposition thus taken can only be used should the witness continue unable to be present.   If he appears and testifies orally the deposition is not available—it ceases to have any validity because the right to take it at all depends altogether upon the inability of the witness to be present. Upon a subsequent trial, should the same witness be then absent, his prior deposition, which by his personal appearance on the first trial became unavailable, cannot be revived. It must be treated as never having been taken.   The reason for this is obvious.   As it is the object of every judicial investigation to ascertain the truth of the alleged facts upon which the asserted rights of the contending parties ultimately depend, it is in the highest degree essential that the methods devised and the means employed for the discovery of the truth should be as free from all opportunities to mislead as human sagacity and skill can make them. A procedure in any system of adjective law which paves the way or affords facilities for the perversion of truth is, in itself, subversive of justice ; and because of its inherent antagonism to the very end for which Courts are organized must necessarily be rejected.   If it is possible that the reading of a deposition on a second trial—the deposition not having been read on the first trial because the witness was then present and testified orally—*may* result in obscuring the truth ; then the deposition should not be permitted to be read if there is no imperative statutory requirement declaring that it shall be read.   It is not the fact that injustice *will* be done, but the possibility that it *may* be done which must be considered.   It is not that a positive wrong in a concrete case will certainly be imposed, but that generally the method, if tolerated, is liable to become an instrument of wrong, that is the aspect to be contemplated.

Now, suppose the witness upon the first trial had testified orally to a matter advantageous to the opposite side, and that in his deposition taken before the first trial no such testimony had been given by him ; or suppose, upon a cross-examination during the first trial, he had flatly contradicted his examination-in-chief, whilst no such contradiction appeared in the deposition ; it would work a great injustice to allow, upon the second trial, the original deposition to be read and thus to deprive the opposite party, in the one instance, of the advantageous matter testified to on the first trial, or, in the other instance, to deprive him of the benefit of the contradicting cross-examination.   If the witness will be absent upon the second trial his deposition should be retaken for use at that trial, so that the opposing party may have the opportunity, at the execution of the second commission, to avail of the witness' antecedent admissions or contradictions.   A non-resident witness is not one within the jurisdiction of the Court, and the inability of the party needing his testimony to produce him at the first trial of a cause is no greater than at the second trial of the same cause, and there is not existing the circumstance that at the first trial the witness testified orally.   These facts distinguish this case from *Woodruff* v. *Munroe*, 33 Md. 146, where it was held that the deposition of a *non-resident* witness taken under a foreign commission issued under *sec. 15 of Art. 35 of the Code* could be read upon a second trial of the cause as well as upon the first trial of it.   The case of *Rogers, Lessee*, v. *Raborg and Redding*, 2 G. & J. 54, bears no analogy to the case at bar.   That was an action of ejectment and the witness whose deposition was admitted had been regularly sworn and examined on the ground upon a survey executed in due form and his testimony was returned with the plots.   Before the trial the witness became a paralytic and was unable to speak.   " The necessity, therefore," said the Court, " of resorting to his deposition, was the same as if he had been dead, and the reason being the same, we think it ought to have been admitted.   And more

strongly than if he had left the State ; his inability to give evidence being produced by the act of God, leaving to the party requiring the benefit of it no means of obtaining it, and without any negligence or fault on his part, which may not always be strictly the case, in relation to a witness who has left the State." The plaintiffs could have retaken the testimony of Becker after the first trial. Their failure to do this cannot be held to have revived the abandoned deposition. The oral testimony of Becker did more than suspend the deposition, it superseded it.

For the error just indicated the judgment must be reversed, and as we do not perceive how a judgment can in any event be recovered against the railway company, a new trial will not be awarded unless the plaintiffs shall request it by an application in writing filed in this Court before the beginning of the next October term.

> *Judgment reversed with costs above and below, with leave to the plaintiffs to ask for a new trial.*

(Decided June 15th, 1900.)