CARLOS QUECEDO *v.* JOHN F. DeVRIES, JR.

[No. 613, September Term, 1973.]

*Decided July 12, 1974.*

The cause was argued before MORTON, MOYLAN and GILBERT, JJ.

*R. Edwin Brown* and *Dennis M. Ettlin,* with whom were *Brown & Sturm* on the brief, for appellant.

*Paul V. McCormick,* with whom were *McInerney, Layne & McCormick* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

As a result of an incident which occurred on July 4, 1970, the appellant, Carlos Quecedo, brought suit against the appellee, John F. DeVries, Jr., a Montgomery County policeman, on four counts, charging (1) assault and battery, (2) false imprisonment, (3) malicious prosecution for assault and battery, and (4) malicious prosecution for disorderly conduct. The case came on initially for trial on December 4, 1972. At the conclusion of the plaintiff's case, a directed verdict was granted in favor of the defendant-appellee as to the fourth count, alleging malicious prosecution on the charge of disorderly conduct. As to the remaining counts, the jury was unable to reach a verdict and a mistrial was declared. At a second trial, beginning on May 4, 1973, the case went to the jury and the jury returned verdicts in favor of the defendant-appellee as to each count. Upon this appeal, the appellant raises the following contentions:

(1) That the court erred in receiving into testimony the transcript of testimony from the first trial of two missing witnesses, rather than receiving the pretrial depositions of those witnesses;

(2) That the court erred in having read to the jury certain remarks of appellant's counsel reflecting adversely on one of the appellant's witnesses who appeared to be under the influence of alcohol while on the witness stand;

(3) That the court erred in refusing to declare a mistrial when the same appellant's witness was asked about a murder with which he had never been charged;

(4) That the court gave an erroneous instruction; and

(5) That the court erroneously did not permit the appellant to relitigate at the second trial the fourth count, as to which the directed verdict had been granted at the first trial.

The first issue deals with the steps taken by the court and the parties to give the jury the benefit of the information possessed by two eyewitnesses to the event. Mrs. Gertrude Seabolt and Mrs. Joan Nielson had both witnessed the stopping of the appellant by the appellee. Both had been deposed by the appellant under the appropriate provisions of Maryland Rule 413. This was done prior to the first trial. Both Mrs. Seabolt and Mrs. Nielson appeared at the first trial and testified under oath. It is not disputed that at the second trial, Mrs. Seabolt was not able to be procured, subpoenas twice having been returned *non est*. A follow-up subpoena issued at the direction of Judge Plummer Shearin was also returned *non est*. Mrs. Nielson was unable to appear at the second trial because of a medical infirmity.

The appellant offered the depositions of both missing witnesses. The appellee objected and the court declined to receive the depositions. The court did permit, however, the full testimony, direct examination and cross-examination, from the first trial to be read to the jury at the second trial. The umbrage taken by the appellant at this procedure strikes us as captious. He argues, essentially, that the substitute testimony by Mode A (reading the transcript of testimony from the former trial) was not to his tactical advantage as much as would have been the substitute testimony by Mode B (the depositions). He complains that they were read by counsel instead of by the court reporter, thereby presumably denying them their full authoritative imprimatur. We know of no rule which would require a deposition any more than a transcript necessarily to be read by a court reporter and not by counsel. In any event, no objection was made to this aspect of the procedure and it is not properly preserved for appellate review. Maryland Rule 1085.

The appellant complains further that the "transcripts were so lengthy that their reading had a soporific effect on the jury." Implicit in that length is the greater possibility that the testimony was in full detail and was subjected to a more scrutinous probing upon cross-examination. The very allegation as made by the appellant supplies its own rebuttal.

Maryland Rule 413 a 3 does provide, in pertinent part:

"The deposition of a witness, whether or not a party, may be used by any party for any purpose against any other party who was present or represented at the taking of the deposition or who had due notice thereof, if the court finds:

(3) that the witness is unable to attend or testify because of age, mental incapacity, sickness, infirmity, or imprisonment; or

(4) that the party offering the deposition has been unable to procure the attendance of the witness by summons; . . ."

Within the clear contemplation of the rule is the fairly routine situation wherein a witness has been deposed and is then, for some reason, unable to attend the trial. The use of the deposition is a permitted exception to the hearsay rule because reasonable assurances of trustworthiness have been provided in the form of the oath, the threat of perjury, confrontation with the adverse party and his counsel, and cross-examination. The rule is simply silent as to the far less routine situation before us at bar where two alternative modes of supplying the missing testimony are readily available. Every advantage, in terms of trustworthiness, surrounding the deposition also surrounds the testimony from the first trial. There was again the oath and threat of perjury. There was again confrontation, not simply with the adverse party but with a judge, a jury and a potential courtroom full of spectators. There was again a full opportunity for cross-examination. Indeed, we would think the cross-examination on that latter occasion ordinarily to have been fuller and more searching than on the former occasion. Counsel, at that point, were fully expecting to go to the jury for the ultimate resolution of the issue and all stops were inevitably out. Although we can see many advantages to the use of testimony from the first trial over the use of the possibly more sterile deposition, we think that the posture of the problem facing the trial judge was that he had available to him two adequate methods of accomplishing the

same desired end. Under those circumstances, we think the election of means to be within the sound discretion of the trial judge, whose decision will not be reversed absent a clear abuse of that discretion.

Although various procedural changes have rendered *Consolidated Ry. Co. v. O'Dea*, 91 Md. 506, 46 A. 1000 (1900), somewhat obsolete in terms of binding authority, the analysis by Chief Judge McSherry of the advantages of testimony from a former trial over an earlier deposition are both current and profound. In that case, a witness had given a deposition prior to a first trial. The witness had then testified at the first trial. A second trial became necessary. The court there ruled that the use of the deposition taken before the first trial as a substitute for testimony at the second trial was legally improper. It was not a matter of discretion, as it now, we hold, would be. The analysis of the impediments inherent in the possibly obsolete and superseded depositions are still, however, timely:

"If it is possible that the reading of a deposition on a second trial — the deposition not having been read on the first trial because the witness was then present and testified orally — *may* result in obscuring the truth; then the deposition should not be permitted to be read if there is no imperative statutory requirement declaring that it shall be read. It is not the fact that injustice *will* be done, but the possibility that it *may* be done which must be considered. It is not that a positive wrong in a concrete case will certainly be imposed, but that generally the method, if tolerated, is liable to become an instrument of wrong, that is the aspect to be contemplated.

Now, suppose the witness upon the first trial had testified orally to a matter advantageous to the opposite side, and that in his deposition taken before the first trial no such testimony had been given by him; or suppose, upon a cross-examination during the first trial, he had flatly contradicted his examination-in-chief, whilst no such contradiction

appeared in the deposition; it would work a great injustice to allow, upon the second trial, the original deposition to be read and thus to deprive the opposite party, in the one instance, of the advantageous matter testified to on the first trial, or, in the other instance, to deprive him of the benefit of the contradicting cross-examination. If the witness will be absent upon the second trial his deposition should be retaken for use at that trial, so that the opposing party may have the opportunity, at the execution of the second commission, to avail of the witness' antecedent admissions or contradictions." 91 Md. at 513-514.

We have reviewed both the depositions and the testimony from the first trial which was offered at the second trial. There is no significant difference between them, certainly as to anything of real substance. We note, moreover, that an adverse party against whom either a deposition or a transcript of earlier testimony is to be used has a stake in the choice just as surely as does the party contemplating such use. The appellee here would have been as fully entitled as was the appellant to argue to the trial judge the advantages and disadvantages that might accrue to him in the choice of one method over another. It is the very presence of such competing interests that makes judicial discretion so necessary. Under the circumstances in this case, there was not remotely an abuse of that discretion.

The appellant's second and third contentions both revolve about a single plaintiff's witness, Charles Hite. However awkward anyone may have been in responding to a difficult situation, the source of the problem is that this appellant's witness took the stand under the influence of alcohol. As the danger signs manifested themselves in the course of the direct examination of Charles Hite, the court excused the jury and engaged in the following colloquy with the witness:

"The Court: . . . Mr. Witness, I seem to detect the odor of alcohol even at this distance from you. Have you been consuming alcohol —

The Witness: Yes, I have had a drink today. I tried to take a drink for my nerves today.

The Court: How many drinks have you had today?

The Witness: I had one drink today.

The Court: When did you have that?

The Witness: I had that about — I think it was about 11:30, 12:00 o'clock. I think it was about 11:30, a quarter to twelve.

The Court: How big a drink was it?

The Witness: It was just a small one, and I had that in orange juice and a glass of vodka. That is what it was."

A full recess then ensued, appellant's counsel seizing the opportunity to huddle with his witness and diagnose him further. The following on-the-record conversation then took place between appellant's counsel and the court:

"Mr. Brown: If the Court pleases, I have spoken with this witness during the recess. I don't believe that the man is physically in shape to go forward with his testimony.

The Court: Were you present, Mr. McCormick? Were you present during this conversation?

Mr. McCormick: No.

The Court: Could you be more specific as to why?

Mr. Brown: He seems to me to be under the influence. I don't believe he is now a credible witness. I hate to say that in his presence, but he is a very material witness.

Now, we do have his testimony at the prior trial. Now, I would—"

The appellant initially moved to withdraw the witness and the court granted the motion. The appellant sought, however, to offer in place of the live witness the transcript of that witness's testimony at the earlier trial. (Ironically, this was the very procedure as to which the appellant took such strenuous objection with respect to two other

witnesses.) The court insisted that he would inform the jury that counsel had concluded that the witness was not physically capable of testifying credibly. Again evaluating the situation tactically, the appellant then sought to withdraw his motion and to put the witness back in the box and to go forward. Another diagnostic recess was permitted. At the conclusion of the recess, Mr. Hite again took the stand. At the conclusion of Hite's testimony, the court informed the jury as follows:

> "The Court: Ladies and gentlemen of the jury: Since you are the triers of fact and it is for you to judge the credibility of all the witnesses in the case in which you sit in your present capacity, at the request of counsel for the defendant, a portion of the transcript of proceedings out of your presence will now be read to you by the reporter because it affects the credibility of a witness who has just completed testifying, and, Mr. Reporter, would you read the first part.
>
> (Whereupon the Court Reporter read the record of the proceedings as follows:
>
> 'Mr. Brown: If the Court pleases, I have spoken with this witness during the recess. I don't believe that the man is physically in shape to go forward with his testimony.
>
> The Court: Were you present, Mr. McCormick? Were you present during this conversation?
>
> Mr. McCormick: No.
>
> The Court: Could you be more specific as to why?
>
> Mr. Brown: He seems to me to be under the influence. I don't believe he is now a credible witness. I hate to say this in his presence, but he is a very material witness.')
>
> The Court: Ladies and gentlemen of the jury: And following a further recess a further statement was made by counsel which I shall now ask the reporter to read.

(Whereupon the Court Reporter read the record of the proceedings as follows:

'Mr. Brown: The witness during the recess seems to have gotten a hold of himself a bit and I am satisfied he is now a competent witness to go forward.')"

We see nothing untoward in the conduct of the court. Mysterious proceedings were obviously afoot and it was meet to offer the jury some explanation. It was the ultimate responsibility of the jury to judge credibility and they were entitled to a knowledge of the relevant factors affecting that credibility. The court in no way expressed its personal opinion on the credibility of the witness or the weight to be given his testimony. We see no error.

The third claim of error also involved the same witness, Charles Hite. The appellee sought to establish that Hite had a bias against policemen. In pursuit of that aim, cross-examination elicited the fact that Hite had killed one Junior Palmer. That answer went in without objection from the appellant. Shortly thereafter, however, the appellant moved for a mistrial. It was not shown that Hite had ever been arrested or convicted and the appellee frankly concedes that he failed to establish anti-police bias. In denying the appellant's motion for a mistrial, the court stated that it did not think that, on the whole, the question so prejudiced the appellant's case as to poison the minds of the jury. The court did give the following curative instruction:

"The Court: Ladies and gentlemen of the jury: The Court upon proper motion has ordered the testimony elicited from the witness concerning prior criminal charges that may or may not have been laid against him be stricken from the record.

The Court, without explaining its reasons, has laid them on the Record here and you are admonished to disregard the testimony concerning the matter of a charge of murder which was mentioned by the defense counsel and anything in connection therewith."

In exercising his sound discretion, the trial judge is in the best position to take the pulse of the situation. This case had been tried for five days in December of 1972 and had survived eight motions for mistrial made by the appellee. The case was retried for five days in April of 1973, surviving four motions for a mistrial by the appellant and two additional motions for a mistrial by the appellee. In *Baldwin v. State*, 5 Md. App. 22, 245 A. 2d 98, we said, at 5 Md. App. 28:

> "The granting of a mistrial is an exercise which rests within the discretion of the trial judge. A mistrial should be granted only where plain and obvious reasons exist, upon the greatest caution and under urgent circumstances. Where, in the exercise of this discretion, the trial court refuses to grant a mistrial, such a decision will not be disturbed on appeal without giving full regard to the fact 'that the trial court is in an advantageous position to judge the question of prejudice, and its decision with reference thereto should not be reversed unless it is clear that there was prejudice.' *Carroll v. State*, 3 Md. App. 50, 53, 237 A. 2d 535, 538 (1968) quoting *Cook v. State*, 225 Md. 603, 610, 171 A. 2d 460, 463, *cert. den.* 368 U.S. 970, 82 S.Ct. 445, 7 L.Ed.2d 398 (1961)."

See also *Bailey v. Wray*, 230 Md. 359, 362-363, 187 A. 2d 101, 103, and *Hurley v. State*, 6 Md. App. 348, 251 A. 2d 241. In view of the strong curative instruction, we see no abuse of discretion by the trial judge in declining to abort for a second time this lengthy and hard-fought litigation. We note, moreover, that the witness Charles Hite, the subject of the appellant's second and third contentions, was one of five appellant's witnesses testifying to the same event. The cumulative nature of his testimony strengthens our belief that error, if any, was harmless and that the trial judge was, therefore, correct in not granting the mistrial.

The appellant's fourth assignment of error is that the

judge, in his instructions to the jury, supplied a critical fact not in evidence. The instruction was as follows:

"In this connection one further reference to the testimony may be appropriate. It appears to the Court that the crucial element of the evidence is what happened immediately prior to the use of the blackjack by the defendant on the person of the plaintiff. The defendant has testified that while he was restraining the plaintiff over the hood of the police cruiser, he felt a sharp pain in his groin. Whether he felt such pain or whether he had reasonable grounds to believe that pain was inflicted either deliberately or inadvertently by the plaintiff is a crucial question before you ladies and gentlemen of the jury."

After emphasizing certain facts which the court considered critical, the judge went on:

"If you find that such an injury or such pain or blow of the kind described by the defendant was so inflicted, and if you believe the defendant's testimony as to what happened as a consequence thereof, then I think you are justified in finding that there was probable cause for charging the defendant, the plaintiff here, the defendant there, with assault and battery."

The appellant's position is strained in the extreme. According to his argument, the appellee never directly testified that he received a blow inflicted by the appellant. That fact was so implicit, however, to make the present contention absurd. All witnesses agreed that the physical confrontation, whoever took the initiative and whoever was at fault, was exclusively between the appellant and the appellee. No one else was remotely involved. The appellant and his witnesses testified that the appellee was the aggressor. The appellee testified that the appellant was the aggressor. The chronology, the sequence of events and the motivation for the struggle were very definitely in issue. The

identity of the combatants was not at all in issue. Of immediate concern was the question of whether the appellee was kicked in the groin, not who kicked him. We see a great deal of imagination but no merit in the contention.

The appellant's fifth and final contention is that the court committed error in not permitting him to introduce evidence bearing on the fourth count, charging malicious prosecution by filing a charge of disorderly conduct. This was the count on which the appellee had received a directed verdict in his favor in the course of the first trial, which later aborted. The judge refused to take evidence on this count, ruling that the directed verdict from the first trial was *res judicata.* It is unnecessary for us to address ourselves to the merits of this contention, since it is clear that even had error been committed in this regard, the error was harmless. The evidence came in and was undisputed that the appellant was tried in the People's Court for Montgomery County on the charge of disorderly conduct and was convicted. This represents a conclusive determination of the existence of probable cause for the institution of the charge and effectively precluded the appellant from demonstrating the critical element of lack of probable cause. *Owens v. Graetzel,* 149 Md. 689, 696, 132 A. 265 (1926). The fact that the appellant appealed to the Circuit Court for Montgomery County and there, upon a trial *de novo,* was found not guilty would not disturb this conclusion. 52 Am. Jur. 2d, *Malicious Prosecution,* § 179, "Existence of probable cause — Conviction in criminal trial; effect of setting aside verdict," pp. 297-298.

*Judgment affirmed; costs to be paid by appellant.*