810 A.2d 996

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Edward Patrick GALLAGHER.**

**Misc. Docket (Subtitle AG) No. 30, September Term, 2001.**

Court of Appeals of Maryland.

Nov. 13, 2002.

Melvin Hirshman, Bar Counsel, Dolores O. Ridgell, Assistant Bar Counsel for Attorney Grievance Commission of Maryland, for petitioner.

Edward Patrick Gallagher, Frederick, for respondent.

BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

Opinion by CATHELL, J.

Bar Counsel, on behalf of the Attorney Grievance Commission, petitioner, and at the direction of the Review Board, filed a petition with this Court seeking disciplinary action against Edward Patrick Gallagher, respondent,[1] pursuant to Md. Rule 16–709.[2] The petition, which is based on the complaint of Mr. Phillip A. Lobo, alleges that respondent violated several Maryland Rules of Professional Conduct (MRPC),[3] two provisions

---

**1.** Mr. Gallagher was admitted to the Bar of this Court on June 19, 1974 and is also a member of the Bar of the District of Columbia. At the time of the conduct which is the subject of this disciplinary action, respondent maintained an office for the practice of law in Bethesda, Maryland. Currently, respondent resides in Frederick County, Maryland and engages in the practice of immigration law for former clients.

**2.** The pertinent provision of Rule 16–709 states that, "[c]harges against an attorney shall be filed by the Bar Counsel acting at the direction of the Review Board." We note that this reference is to Md. Rule 16–709 as stated in the 2001 edition of the Maryland Rules. What was formerly comprised in Rule 16–709 is now encompassed in several different rules in the 2002 edition. Respondent excepts to the use of the older version of the Maryland Rules. We overrule this exception, which will be discussed *infra*.

**3.** The relevant provisions of the MRPC include:
"**Rule 1.4. Communication.**
(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
. . .
"**Rule 1.15. Safekeeping property.**
(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

of the Business Occupations and Professions Article of the Maryland Code,[4] and several sections of Title 16 of the Maryland Rules.[5]

_____

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

. . .

**"Rule 8.4. Misconduct.**

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice . . . ."

4. The relevant provisions of the Business Occupations and Professions Article of the Maryland Code include:

**" § 10–302. Attorney trust account.**

(a) _Required._—Unless a lawyer or the firm of the lawyer maintains an attorney trust account in accordance with this subtitle and the Maryland Rules, the lawyer may not accept trust money.

. . .

**" § 10–306. Misuse of trust money.**

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

. . .

**" § 10–606. Penalties.**

. . .

(b) _Attorney trust accounts._—A person who willfully violates any provision of Subtitle 3, Part I of this title, except for the requirement that a lawyer deposit trust moneys in an attorney trust account for charitable purposes under § 10–303 of this title, is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both."

5. The relevant provisions of the Maryland Rules include:

**"Rule 16–603. Duty to maintain account.**

An attorney or the attorney's law firm shall maintain one or more attorney trust accounts for the deposit of funds received from any source for the intended benefit of clients or third persons. The account or accounts shall be maintained in this State, in the District of Columbia, or in a state contiguous to this State, and shall be with

On November 5, 2001, pursuant to Md. Rules 16–709(b) and

an approved financial institution. Unless an attorney maintains such an account, or is a member of or employed by a law firm that maintains such an account, an attorney may not receive and accept funds as an attorney from any source intended in whole or in part for the benefit of a client or third person.

**"Rule 16–604. Trust account—Required deposits.**

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person.

. . .

**"Rule 16–607. Commingling of funds.**

a. **General prohibition.** An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule.

b. **Exceptions.** 1. An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, including those fees that cannot be charged against interest due to the Maryland Legal Services Corporation Fund pursuant to Rule 16–610 b 1(D), or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operating account maintained by the attorney or law firm. The attorney or law firm may deposit into an attorney trust account any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.

2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.

3. Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

**"Rule 16–609. Prohibited transactions.**

An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer."

16–711(a),[6] this Court assigned the matter to a judge in the Circuit Court for Montgomery County. On January 16, 2002, this Court granted respondent's motion to transfer the case to the Circuit Court for Frederick County and assigned Judge Julie R. Stevenson to conduct an evidentiary hearing and to make findings of fact and conclusions of law with respect to respondent's case. Respondent was duly served and he filed a timely answer to the petition. The evidentiary hearing took place on March 26 and 27, 2002. Judge Stevenson heard testimony from three witnesses of the petitioner, including: Sterling Fletcher, petitioner's investigator, Laurence Johnson, an expert in the area of immigration law and a member of the Maryland Bar and John DeBone, petitioner's paralegal. In addition to this testimony, petitioner read portions of the following into the record: respondent's testimony at the Inquiry Panel hearing held in this matter on February 28, 2001, respondent's testimony from petitioner's March 5, 2002 deposition of respondent and respondent's answers to petitioner's discovery requests. Petitioner's evidence also included a videotape of the deposition of the complainant, Phillip A. Lobo, which was admitted by the court, over respondent's objection, pursuant to Md. Rule 2–419(a)(3)(D).[7] After his motions for dismissal and a continuance were denied, respondent offered no witnesses or additional evidence.

---

6. Rule 16–709(b) states that the "Court of Appeals by order may direct that the charges be transmitted to and heard in any court and shall designate the judge or judges to hear the charges and the clerk responsible for maintaining the record in the proceeding." Rule 16–711(a) states that a "written statement of the findings of facts and conclusions of law shall be filed in the record of the proceedings and copies sent to all parties."

 We note that the references to these rules are to their form in the 2001 edition of the Maryland Rules. What was formerly comprised in Rule 16–709 is now encompassed in several different rules in the 2002 edition. What was Rule 16–711(a), is now partly encompassed in Rule 16–759.

7. In filing his exceptions, respondent excepts to the admission of Mr. Lobo's deposition testimony under Md. Rule 2–419(a)(3)(C). The hearing court actually applied Rule 2–419(a)(3)(D).

After the hearing, Judge Stevenson found, by clear and convincing evidence, that respondent willfully misappropriated funds and was in violation of Md. Rules 16–603, 16–604, 16–606, 16–607 and 16–609, Md.Code (1989, 2000 Repl.Vol., 2001 Supp.) §§ 10–302, 306 of the Business Occupations and Professions Article, as well as MRPC 1.15(a) and (b), 1.4(a) and 8.4(a), (b), (c) and (d). Respondent filed in this Court several exceptions to Judge Stevenson's findings of fact and conclusions of law. We overrule these exceptions and accept the hearing judge's findings of fact and conclusions of law. Considering respondent's egregious conduct, the appropriate sanction is disbarment.

## I. Facts

We adopt the hearing court's findings of fact, but reorganize those facts to better suit the needs of this opinion. The facts are as follows:

### A. The Complaint

This disciplinary hearing was initiated by a complaint made by Phillip A. Lobo (hereinafter, "Mr.Lobo") arising out of respondent's handling of Mr. Lobo's $30,000, which was to be deposited into an escrow account in the course of the representation of Mr. Lobo in obtaining a visa to enter the United States from India. Mr. Lobo, a citizen of India, currently resides in Australia. In 1998, petitioner received a letter from Mr. Lobo's Australian counsel stating Mr. Lobo's claim that respondent failed to return his $30,000 that was to be deposited in an escrow account in March of 1996.

### B. The Agreement/Representation

In 1996, in addition to practicing law out of his Bethesda, Maryland office, respondent alleged that he also offered clients financial and investment advice. At that time, respondent had been taking referrals from a former client, Harbhagwan S. Suri (hereinafter, "Mr.Suri"), since 1995. Respondent represented Mr. Suri in Mr. Suri's effort to obtain a L–1 Visa to enter the United States from India. Mr. Suri obtained this

visa, but had returned to India by 1995. Mr. Suri placed ads in a Bombay, India newspaper soliciting businessmen interested in obtaining visas to enter the United States. In February of 1996, Mr. Lobo read such an ad and contacted Mr. Suri, who he did not know prior to that time.

Mr. Lobo met with Mr. Suri and was told that Mr. Suri had a partner in the United States who could assist Mr. Lobo in obtaining a L–1 Visa to enter the United States. He told Mr. Lobo that respondent was his partner and showed Mr. Lobo documents that corroborated his partnership with respondent. Mr. Suri then explained the visa process and its expenses to Mr. Lobo. Mr. Lobo understood that Mr. Suri would prepare and complete the necessary documents in India and then forward them to respondent so that respondent could file them with the appropriate agency. Mr. Lobo was told that the process would cost the equivalent of between $7,000 and $7,500. Mr. Lobo agreed to engage their services by initially paying Mr. Suri the equivalent of $3,500.

During the preparation of the paperwork in India, Mr. Suri informed Mr. Lobo that Mr. Lobo's visa application could be expedited by placing $50,000 into an escrow account in the United States. He explained that this was necessary in order to convey Mr. Lobo's sincerity in regard to immigrating to the United States and would assist Mr. Lobo to commence operations for a United States subsidiary to his Indian company, Lobo Development. Although Mr. Lobo was initially disinclined to deposit this money, he eventually agreed to wire $30,000 to respondent with the understanding that it would be deposited into an escrow account. In late February of 1996, Mr. Lobo flew to Hong Kong and later wired $30,000 to respondent's personal bank account at Riggs National Bank on March 1, 1996. Mr. Suri gave respondent's account information to Mr. Lobo. Along with the money, Mr. Lobo sent respondent a letter and a photocopy of the transfer details via facsimile. This was the first direct communication between Mr. Lobo and respondent and it included, in addition to a request for written conformation and a copy of the escrow agreement from respondent, the language, "IN CASE OF

NON–PERFORMANCE ON PROJECT FUNDING AND OR INABILITY TO OBTAIN L–1 VISA APPROVAL FOR ME, THIS DEPOSIT MAY BE CREDITED TO MY ACCOUNT."

On the same day, respondent sent a facsimile to Mr. Lobo in order to confirm respondent's receipt of Mr. Lobo's $30,000. The facsimile also included the escrow agreement, which was signed by both respondent and Mr. Suri. The letter was printed on respondent's letterhead. The escrow agreement states:

*"ESCROW AGREEMENT*

I, Edward Patrick Gallagher, Attorney–at–Law, do hereby agree to deposit and place in my legal escrow account at Riggs National Bank here in the Untied States the sum of US$30,000.00 (Thirty Thousand U.S. Dollars) as deposited by Mr. Phillip A. Lobo.

This amount shall remain in my legal escrow account for the purpose for which it is deposited, namely as a good faith deposit for Master Host Inn and Howard Johnson–Richmond. In case of non-performance on project funding and or inability to obtain L–1 Visa approval for Mr. Phillip A. Lobo, this deposit will be refunded to the depositor promptly.

This Escrow Agreement is jointly endorsed by Mr. Harbhagwan S. Suri, President, Intercontinental Business Services (USA), Inc. as well and the same guarantee of deposit refund will apply.

| | |
|---|---|
| Edward Patrick Gallagher, Esquire | Harbhagwan S. Suri, President |
| Attorney–at–Law | Intercontinental Business Services |
| | (USA). Maryland, USA |

Escrow Account:
RIGGS NATIONAL BANK
Account No. 08–524–773 (ABA # 054000030)
P.O. Box 1525
Washington, D.C. 20075 (USA)
Telex: 197739 RIGGS UT

*Name of Depositor:*
Mr. Phillip A. Lobo

| | |
|---|---|
| Phillip A. Lobo | Date" |

Signatures appear on the lines above the names of Mr. Suri and respondent. The stamp impression of the Intercontinental Business Services (USA), Inc. seal is under Mr. Suri's signature. The other lines were left blank for Mr. Lobo to sign and date. Respondent admits to preparing and signing this escrow agreement and the attached letter.

Mr. Lobo testified that he then returned to India from Hong Kong on March 9, 1996 and met with Mr. Suri, who then assisted Mr. Lobo in gathering information pertaining to Mr. Lobo's application for a L–1 Visa. When Mr. Lobo's L–1 Visa petition was completed, respondent sent it to the United States Immigration and Naturalization Service (INS) on April 11, 1996. The petition was approved by the INS subject to the United States Consulate's approval of Mr. Lobo's petition. The INS instructed Mr. Lobo to complete an interview at the United States Consulate in Bombay, India. The United States Consulate in Bombay denied Mr. Lobo's petition, stating that it needed "administrative processing." At respondent's hearing, testimony by petitioner's expert explained that this likely meant that Mr. Lobo's petition did not comply with the provision of the law or regulations, although submission of further documents would warrant further consideration.

In August of 1996, five months after he began the process, Mr. Lobo had yet to receive the L–1 Visa. He subsequently abandoned the matter and immigrated to Australia without the assistance of respondent. Mr. Lobo testified that he then requested the return of his $30,000 from respondent via Mr. Suri. After not receiving the money, Mr. Lobo directly contacted respondent by sending him a letter via facsimile on January 23, 1997 requesting the return of his $30,000. Mr. Lobo received no response. On July 22, 1997, Mr. Lobo faxed another letter to respondent, again requesting the refund of his $30,000. Respondent responded in a facsimile dated July 25, 1997. Respondent's reply to Mr. Lobo's July 22nd letter stated:

"Reference your fax, please note that your checking account here in the United States was closed as per instructions of your agent and partner, Mr. H. Suri, on July 11, 1997 and distributed to him. He has in his possession 'all' records of this account and you can obtain them through him at his office in Bombay. For your information, he has departed this date from the United States and should be in Bombay sometime next week."

Mr. Lobo testified that he has not received any part of the $30,000 wired to respondent from either respondent or Mr. Suri.

At the Inquiry Panel in this matter, respondent produced a document, dated February 28, 1997, purporting to be a copy of a letter from him to Mr. Lobo in response to Mr. Lobo's January 23, 1996 letter. However, Mr. Sterling Fletcher, the petitioner's investigator, doubted the authenticity of the letter. Mr. Fletcher's doubt stemmed from the address on respondent's letterhead; it was stated as 111 North Berwick, Williamsburg, Virginia 23188, although respondent did not move to that address until March of 1998. In addition, there was no mention of this February letter in respondent's July 25, 1996 letter to Mr. Lobo.

### C. The Money

Petitioner, through the work of its employee, John DeBone, conducted an investigation of respondent's bank accounts at Riggs National Bank. The account into which Mr. Lobo wired $30,000 on March 1, 1996 was not an escrow account, but a personal account entitled "Edward Patrick Gallagher, Attorney–At–Law" (hereinafter, "Attorney Account"). Mr. DeBone's review of this Attorney Account's transactions showed that the account was primarily used by respondent for business and personal expenses, and thus was not an escrow account, and that its balance before Mr. Lobo's March 1, 1996 wire of $30,000 was approximately $1,200. On March 4, 1996, prior to the opening of an escrow account, two disbursements of $3,180 were made from the Attorney Account and wired to an account in England.

An escrow account for Mr. Lobo was created on March 4, 1996 and was entitled, "Edward Patrick Gallagher, Esquire, Escrow for Phillip Lobo" (hereinafter, "Escrow Account"). However, the account was not opened with the entire $30,000 that Mr. Lobo had agreed to when he wired it to respondent. Mr. DeBone testified, and respondent's bank records indicate, that the account was opened with only $23,570. Respondent and his wife, Joann N. Gallagher, were signers on this account,

which was an interest bearing money market checking account. A wire transfer of $549.75 was made from the Escrow Account to a bank in England on March 12, 1996. Over the next six months, five checks cleared from the account, which brought the Escrow Account's balance to less than $600. All five checks were made payable to respondent, with the first check being signed by Mrs. Gallagher. The four other checks were signed by respondent. On February 18, 1997, check number 109, for $505, had drained the account to approximately $50. By July 11, 1997, when respondent closed the account, the Escrow Account had a balance of $22.37, which included seven service charge deductions.

The hearing court found that there was no credible explanation for the disbursement of the $30,000 that Mr. Lobo wired to respondent on March 1, 1996 and that these disbursements were "clearly inconsistent" with the Escrow Agreement, which respondent had signed. The hearing court highlighted the fact that respondent claimed, that between March 1st and 3rd of 1996, he received one or more calls from Mr. Suri and that Mr. Suri indicated that Mr. Lobo was present and wished to disburse funds from the Escrow Account. Although respondent claims that a voice in the background of Mr. Suri's office was Mr. Lobo, respondent could not have known Mr. Lobo's voice because they had never met. In addition, Mr. Lobo testified that he did not return to Bombay until March 9, 1996 and respondent knew that Mr. Lobo was in Hong Kong at that time because that is the location from which Mr. Lobo wired the $30,000 to respondent. Furthermore, Judge Stevenson found that respondent's testimony concerning these calls was not consistent with his prior representations. During petitioner's investigation in May 1999, respondent told Mr. Fletcher the following: that respondent had lost all of his documentation in Mr. Lobo's file due to a recent move and that respondent had communicated with Mr. Lobo only once at the beginning of his representation of Mr. Lobo. Respondent's answer to petitioner's interrogatories similarly stated that he only spoke to Mr. Lobo once via telephone.

Respondent admitted to his representation of Mr. Lobo and to the receipt of the $30,000 in question, yet he denied that the money was to be held in an escrow account. He explained that his departure from the terms of the escrow agreement was due to telephone conversations between respondent and Mr. Suri. Respondent claims that Mr. Suri and Mr. Lobo were partners and business associates and that Mr. Suri was authorized to speak for Mr. Lobo. Respondent claims that he disbursed the funds in the Escrow Account according to Mr. Suri's instructions. Respondent admitted that he was never shown any writing that imposed an agency relationship between Mr. Suri and Mr. Lobo and respondent did not produce any evidence to corroborate these claims.[8]

The hearing court specifically found that respondent's explanation of why he dishonored the escrow agreement between himself and Mr. Lobo was not supported by the facts. After citing to the fact that respondent could not corroborate his claims of a prior business relationship between Mr. Suri and Mr. Lobo, the hearing court found there to be sufficient evidence to illustrate that Mr. Suri and respondent were, in fact, business associates. First, Mr. Lobo testified to the Suri-respondent relationship. Although respondent denied any relationship with Mr. Suri, the State of Maryland Personal Property Tax Return for International Business Services (USA), Inc. (hereinafter "IBS"), which was prepared by respondent and his wife, indicated that respondent, his wife, and Mr. Suri were the officers of IBS. Respondent also had signature authority for an IBS bank account, his 1996 office address was the same address as IBS's letterhead, he received money from IBS and he paid the rent for IBS from his own personal account. In addition, a business letter from respondent's wife to Mr. Lobo identified Mr. Suri as her agent in Bombay.

---

8. Respondent did produce a November 24, 1997 document that mentions both Mr. Suri and Mr. Lobo in connection with a deal to purchase property in Germany. However, this letter could not have been relied on when respondent withdrew the funds from the Escrow Account, as that account was closed on July 11, 1997.

The court found respondent's actions to be contrary to "an honest belief that Lobo knew about or had authorized the disbursements from the account, facts which Lobo denied." After Mr. Lobo formally requested a refund of the entire $30,000, respondent made yet another withdrawal of $505 to himself without questioning or attempting to verify his understanding that Mr. Suri had the authority to disburse the funds. Respondent never questioned why Mr. Lobo was demanding a refund for the entire amount.

Additionally, the hearing court found, contrary to respondent's assertion, that Mr. Suri's accounting of the money does not corroborate respondent's version of the disbursements. In letters purportedly written by Mr. Suri, Mr. Suri believed that the entire balance of $30,000 was intact as of May 26, 1996. However, by that time, respondent had disbursed approximately $26,000 of those funds. In addition, Mr. Suri's accounting does not mention a $10,000 check written to respondent in May of 1996. Respondent claims that Mr. Suri told respondent to give the disbursement to a Mr. Bagaria, a Bombay businessman in the United States, as authorized by Mr. Lobo. However, Mr. Suri's accounting has no record of the disbursement and Mr. Lobo denies knowing Mr. Bagaria. No evidence showed any relation between Mr. Lobo and Mr. Bagaria, but it did reveal that respondent and Mr. Bagaria had a prior business relationship, as respondent had set up a corporation for Mr. Bagaria on November 9, 1995. Finally, Mr. Suri's accounting of the Escrow Account identifies that approximately $6,250 was returned to Mr. Lobo, while respondent's accounting indicates that only $22.37 was returned. Mr. Lobo denies receiving any money and the bank records show no transfers from the Escrow Account to Mr. Suri or Mr. Lobo.

While Mr. Lobo testified that his original payment to Mr. Suri was to cover all fees for the visa process, respondent stated that he took money from the account for fees relating to his representation of Mr. Lobo. The court found that even if respondent was entitled to any fee, then the approximate $6,300 in legal fees still does not account for the absence of the

remaining money, totaling approximately $23,700, still owed to Mr. Lobo.

The hearing court found that the initial wire transfers of money to England, taken from Mr. Lobo's original $30,000 wire transfer, were not made to further Mr. Lobo's business interests, but rather to further the interests of respondent and IBS.[9] At his deposition, respondent indicated that these wire transfers were used to pay "commitment/application fees to Anglo American Ventures, Ltd.," in an effort to obtain large scale financing from that overseas institution. Mr. Lobo denies any dealings with Anglo American at this time. In fact, the evidence reveals that IBS had actually been attempting to procure financing for the purchase of Master Host Inn and Howard Johnson–Richmond prior to respondent's contact with Mr. Lobo. Respondent admits that he and his wife were attempting to obtain this financing in 1995 and 1996. In August of 1996, after Mr Lobo had moved to Australia and abandoned his attempt to obtain a L–1 Visa to come to the United States, IBS and Mr. Suri were still attempting to buy and renovate the Master Host Inn.

### D. The Visa Process

The hearing court qualified petitioner's witness, Laurence Johnson, as an expert on immigration matters. Mr. Johnson testified that obtaining a L–1 Visa requires *both* the approval of the petition by the INS *and* the approval of the United States Consulate in the foreign country. Thus, the hearing court found that respondent had not procured a L–1 Visa for Mr. Lobo and respondent's repeated statements to the effect that he had obtained approval of the L–1 Visa for Lobo misstated the facts and the law. In fact, Mr. Johnson specifically refuted respondent's assertion made in a letter to Mr. Lobo, that the United States Consulate's role in the visa process was merely a rubber stamp.

---

**9.** One disbursement of $549.75 was made directly from the escrow account, while two disbursements of $3,180 were wired before the escrow account was created.

Respondent's testimony that Mr. Lobo's testimony is not credible because he was denied entry into the United States through a L–1 Visa was also refuted by Mr. Johnson's testimony. Mr. Johnson testified that one cannot make a negative inference concerning Mr. Lobo's character merely from the fact that the United States Consulate denied Mr. Lobo's L–1 Visa petition. Specifically, Mr. Johnson testified that Mr. Lobo's L–1 Visa petition, that had been denied by the United States Consulate in Bombay, India, had no notation referring to fraud, as is the usual practice when a petition is denied because of applicant fraud.

### E. Additional Misappropriation

Petitioner offered evidence, and the hearing court found, that respondent had misappropriated funds of another trust account and that the funds in question within the Escrow Account for Mr. Lobo were not the only funds that respondent used for an unauthorized purpose. On February 26, 1997, respondent received a check from Jatin Damani for $26,000. Respondent testified that these funds were to be held in trust for the client until they were returned on August 7, 1997. The bank records indicate that these funds were not held in trust after the funds were deposited on April 3, 1997. On July 18, 1997, the balance of the trust account was under $5,000. Although respondent did refund the $26,000, he was only able to do so because $25,000 was deposited to the account in late July of 1997. Those funds came from respondent's and his wife's other accounts, including "two checks totaling $10,000 which bear a signature appearing to be the same as the signature on the Escrow Agreement and letters purporting to be from Suri."

We hold that there was clear and convincing evidence in the record to support the hearing court's findings of fact and that those findings were not clearly erroneous.

### F. The Hearing Judge's Conclusions of Law

The hearing judge subsequently concluded, based on the findings of fact proven by clear and convincing evidence, that

respondent violated several Maryland Rules. The court concluded the following:

"That on March 1, 1996, the Respondent falsely represented to Lobo that he would hold Lobo's $30,000 in a legal escrow account subject to his being able to obtain an L–1 Visa for Lobo and/or project funding for Master Host Inn and Howard Johnson–Richmond, that Lobo, in reliance on the Respondent's representation, transferred $30,000 to the Respondent's bank account, that Lobo did not receive an L–1 Visa, that the funding for the purchase of the hotels was never obtained and, in fact, Respondent made a claim for the return of the fees paid to Anglo American;

"That, contrary to the written agreement, Respondent disbursed the funds to Anglo American and himself in breach of his fiduciary duty to Lobo. Respondent's representations to Petitioner during the investigation of Lobo's complaint that he was authorized to disburse these funds in a manner inconsistent with the written agreement is not credible in light of the facts that he, his wife and Suri through IBS were attempting to obtain funding to purchase the two properties in question, that the funding was never received, and that Suri's letters to the Petitioner demonstrate that he was not aware of the manner in which the funds were disbursed;

"That the Respondent disbursed all funds from the account, except the funds sent to Anglo American, to himself, and used the funds in a manner inconsistent with the escrow agreement and for purposes other than the purpose for which the funds were entrusted thereby misappropriating the funds in violation of Maryland Rule 16–609; that this conduct was willful and not the result of mistake or negligence and the Respondent knew that he was using the funds in a manner inconsistent with the Escrow Agreement in violation of Maryland Code Annotated Business Occupations and Professions Article § 10–306. *See, Attorney Grievance Commission v. Glenn,* 341 Md. 448, 671 A.2d 463 (1996) and 10–606;

"That the Respondent also misappropriated funds he obtained from a client identified as Jatin Damani/Pratik Investments on February 26, 1997 and, on or about August 7, 1997, repaid that client from funds received from other sources. These funds were also deposited to the attorney-at-law account and not to a properly designated trust account and commingled with personal funds of the Respondent;

"That the Respondent did not maintain a properly designated account in compliance with Rule of Professional Conduct (MRPC) 1.15, Title 16 Chapter 600 of the Maryland Rules and Maryland Code Annotated Business Occupations and Professions Art. § 10–302 since the account into which the Lobo funds were deposited was titled Edward Patrick Gallagher, Attorney–at–Law and was not in compliance with Rule 16–606 in that the checks and deposit tickets for the account did not bear the appropriate designation: 'Attorney Trust Account', 'Attorney Escrow Account', or 'Clients' Funds Account: ['']

"That the Respondent commingled client funds with his personal funds in the attorney-at-law account on at least two occasions in 1996 and 1997 in violation of MRPC 1.15(a) and Maryland Rule 16–607;

"That the Respondent did not maintain records for the Lobo funds and failed to provide Lobo with an accounting for these funds upon request in violation of MRPC 1.15(b);

"That the Respondent received and accepted funds as an attorney intended in whole or in part to benefit a client or third person in which he did not maintain a properly designated attorney trust account in compliance with Maryland Rule 16–603;

"That the Respondent violated Maryland Rule 16–604 which provides that all funds received and accepted by an attorney in this state from a client or third person to be delivered in whole or part to a client or third person, unless received as payment of fees owed to the attorney by the client or in reimbursement for expenses ... shall be deposited to an attorney trust account, since the $30,000 received

on March 1, 1996 by the Respondent and the $26,000 received by the Respondent on February 26, 1997 were not received as payment of fees or expenses owed to the Respondent;

"That the Respondent failed to keep Lobo reasonably informed about the status of the representation and the handling of the $30,000 in violation of MRPC 1.4(a);

"That the Respondent also violated MRPC 8.4(a) by violating the Rules of Professional Conduct:

"That the Respondent violated MRPC 8.4(b) in that the misappropriation of clients' funds constitutes criminal conduct which adversely reflects on his fitness to practice;

"That the Respondent violated MRPC 8.4(c) in that his misappropriation of client funds and misrepresentations to Lobo that the funds would be held in a legal escrow account and returned pursuant to the Escrow Agreement, and misrepresentations to Lobo and Petitioner that he had been successful in obtaining an L–1 Visa for Lobo and authorized to disburse Lobo's funds constitutes conduct involving dishonesty, fraud, deceit or misrepresentation; and,

"That the Respondent violated MRPC 8.4(d) by engaging in the conduct described above which constitutes conduct prejudicial to the administration of justice." [Footnotes omitted.] [Alteration added.]

On August 2, 2002, respondent filed in this Court several exceptions to Judge Stevenson's findings of fact and conclusions of law. Petitioner did not file any exceptions.

## II. Discussion

### A. Standard of Review

This Court reviews attorney disciplinary proceedings according to the well established standard resting on the premise that "[t]his Court has original jurisdiction over attorney discipline proceedings." *Attorney Grievance Comm'n v. Dunietz,* 368 Md. 419, 427, 795 A.2d 706, 710–711 (2002) (citing *Attorney Grievance Comm'n v. Snyder,* 368 Md. 242, 253, 793 A.2d 515, 521 (2002)); *Attorney Grievance Comm'n v. Harris,*

366 Md. 376, 388, 784 A.2d 516, 523 (2001); Md. Rule 16–709(b) (stating that "[c]harges against an attorney shall be filed on behalf of the [Attorney Grievance] Commission in the Court of Appeals"); *Attorney Grievance Comm'n v. Gavin,* 350 Md. 176, 189, 711 A.2d 193, 200 (1998); *Attorney Grievance Comm'n v. Adams,* 349 Md. 86, 93, 706 A.2d 1080, 1083 (1998); *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 470, 671 A.2d 463, 473 (1996); *Attorney Grievance Comm'n v. Kent,* 337 Md. 361, 371, 653 A.2d 909, 914 (1995); *Attorney Grievance Comm'n v. Powell,* 328 Md. 276, 287, 614 A.2d 102, 108 (1992). Furthermore, "[a]s the Court of original and complete jurisdiction for attorney disciplinary proceedings in Maryland, we conduct an independent review of the record." *Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 97, 797 A.2d 757, 763 (2002) (quoting *Snyder,* 368 Md. at 253, 793 A.2d at 521 (citing *Attorney Grievance Comm'n v. Garland,* 345 Md. 383, 392, 692 A.2d 465, 469 (1997))).

In our review of the record, "[t]he hearing judge's findings of fact will be accepted unless we determine that they are clearly erroneous." *Garfield,* 369 Md. at 97, 797 A.2d at 763 (quoting *Snyder,* 368 Md. at 253, 793 A.2d at 521 (citations omitted)). *See also Dunietz,* 368 Md. at 427–28, 795 A.2d at 710–11 ("The hearing judge's findings of fact are *'prima facie* correct and will not be disturbed unless clearly erroneous.'") (quoting *Attorney Grievance Comm'n v. Zdravkovich,* 362 Md. 1, 21, 762 A.2d 950, 960–61 (2000)); *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 388, 794 A.2d 92, 100 (2002) ("Factual findings of the hearing judge will not be disturbed if they are based on clear and convincing evidence."). Clear and convincing evidence "must be more than a mere preponderance but not beyond a reasonable doubt." *Harris,* 366 Md. at 389, 784 A.2d at 523–24 (quoting *Attorney Grievance Comm'n v. Mooney,* 359 Md. 56, 79, 753 A.2d 17, 29 (2000)). We recently explained in *Dunietz* that "[a]s to the hearing judge's conclusions of law, 'our consideration is essentially *de novo.'*" *Dunietz,* 368 Md. at 428, 795 A.2d at 711 (quoting *Attorney Grievance Comm'n v. Thompson,* 367 Md. 315, 322, 786 A.2d

763, 768 (2001) (quoting *Attorney Grievance Comm'n v. Briscoe,* 357 Md. 554, 562, 745 A.2d 1037, 1041 (2000))).

Respondent files with this Court several exceptions to the hearing court's findings of fact and conclusions of law. In these proceedings, respondent represented himself *pro se.* When enumerating his exceptions, respondent did not clearly express whether he was excepting to Judge Stevenson's findings of fact or conclusions of law. He also repeated many of his exceptions in each section of his written submission to this Court. As such, this Court gives its own labels to respondent's exceptions.

## B. Respondent's Factual Exceptions:

In discussing respondent's factual exceptions, this Court has combined several of respondent's points in the interest of judicial economy and because many of respondent's exceptions are muddled, thus some can better be incorporated into other exceptions. Respondent makes three discernable exceptions in regard to the hearing court's assessment of the facts. First, respondent excepts to petitioner's investigatory methods, as he claims that they failed to properly investigate Mr. Lobo. Next, respondent's main factual exception pertains to the hearing court's assessment of the credibility of the complainant, Mr. Lobo. Respondent claims that several factors supposedly affect Mr. Lobo's credibility and that the hearing court did not properly evaluate any of these factors. Finally, respondent excepts to the hearing court's finding that an escrow agreement between respondent and Mr. Lobo existed. Each of respondent's factual exceptions are refuted by sufficient factual bases and strong evidentiary support, as found by the hearing judge. Thus, these exceptions are overruled.

Respondent's claims that Mr. Lobo's credibility was not investigated by petitioner and assessed properly by the hearing judge find no support in the record. Petitioner undertook an exhaustive, four-year investigation that included depositions, interrogatories, requests for admissions, an extensive financial investigation, which subsequently unveiled a violation unrelated to Mr. Lobo's complaint, and culminated in the

presentation of sufficient evidence of respondent's multiple violations of the Maryland Rules. Respondent's main contention with petitioner's investigation was that petitioner did not "conduct an investigation of Mr. Phillip A. Lobo, the Complainant, and his credibility." Respondent requested that petitioner provide financial documents, and the like, so that respondent could impeach the answers Mr. Lobo provided to respondent's questions during Mr. Lobo's deposition. In other words, respondent requested that petitioner, after it satisfied its own burden of proof, should have additionally explored every lead that could possibly assist respondent's defense. That is the purpose of defense counsel. Petitioner is not responsible for respondent's inability to investigate possible defenses.

Despite respondent's exception and the fact that respondent's conduct, not Mr. Lobo's, is the focus of this disciplinary proceeding, the record shows that Judge Stevenson did take Mr. Lobo's credibility into account when making her assessment of the evidence before her. In a preliminary motion heard directly prior to the start of the March 26, 2002 hearing, Judge Stevenson heard arguments on respondent's request for petitioner to produce documents of a non-party witness, namely Mr. Lobo's financial records and other documents purported to be relevant to Mr. Lobo's credibility and the possible commission of fraud in India. In ruling on respondent's motion, Judge Stevenson said:

> "I'm going to deny the request for production of documents. I do note, however, the deposition has already been taken. I'm accepting the representation that these issues regarding this documentation and the status were raised and certainly do raise credibility issues for the Court to assess in determining the truthfulness of the testimony that is being presented before this Court."

During the hearing, petitioner presented expert testimony refuting respondent's contention that the United States Consulate's denial of Mr. Lobo's L–1 Visa petition was due to credibility issues. In fact, Mr. Johnson stated that the Consulate denied the petition due to "administrative processing" and

did not note any fraud, as is the usual practice. The hearing judge also viewed the videotaped deposition of Mr. Lobo and was able to assess his answers, demeanor and credibility in answering both the petitioner's and respondent's questions. It is apparent that the hearing court had before it sufficient facts, including respondent's claims of fraud and denial of the visa, to assess Mr. Lobo's credibility. We have held that:

"The hearing judge is in the best position to evaluate the credibility of the witnesses and to decide which one to believe and, as we have said, to pick and choose which evidence to rely upon. The judge was free to disregard the testimony of respondent if the judge believed the evidence was not credible."

*Monfried,* 368 Md. at 390, 794 A.2d at 101. Given this settled law and absent clear error, we see no reason to disturb the hearing judge's finding in that regard.

Lastly, respondent's exception to the hearing court's finding that there was an agreement between respondent and Mr. Lobo to secure Mr. Lobo's $30,000 in an attorney escrow account, is contrary to all the evidence except respondent's own, uncorroborated, testimony. Petitioner presented an escrow agreement between respondent, Mr. Suri and Mr. Lobo, which was signed and dated by respondent and Mr. Suri.[10] It is of little consequence that the document was unsigned by Mr. Lobo. It was a document prepared by respondent to memorialize the agreement between the parties as to the escrow status of the $30,000 wired to respondent by Mr. Lobo. It was transmitted to Mr. Lobo after Lobo's money had been received by respondent. Petitioner sought to utilize the document as evidence against respondent, not against Mr. Lobo. In addition, as we have indicated, Mr. Lobo had already forwarded the $30,000 to respondent with a request to put the money into such an escrow account, thus respondent's reply to Mr. Lobo, including the escrow agreement signed by respondent and Mr. Suri, established the mutuality of intent for respon-

---

**10.** The exact wording of this agreement can be found within the discussion of the facts, *supra.*

dent to create an escrow account by respondent on behalf of Mr. Lobo. Respondent's subsequent creation of the account, named "Edward Patrick Gallagher, Esquire, Escrow for Phillip Lobo," is additional evidence that an escrow agreement existed. *See Porter v. General Boiler Casing Co., Inc.,* 284 Md. 402, 396 A.2d 1090 (1979) (holding that a signature is not required in order to bring a contract into existence).

Respondent did not produce any evidence to corroborate his contention that Mr. Lobo orally altered the escrow agreement after the money was wired to respondent. In fact, as previously mentioned, petitioner produced several pieces of evidence to the contrary. There were no writings supporting this alleged alteration, Mr. Lobo denied such an oral alteration and respondent continued to drain Mr. Lobo's account even after Mr. Lobo formally requested the return of the entire $30,000. Additionally, Mr. Suri's accounting does not correspond to that of respondent's, and a letter written by Mr. Suri shows that he did not know the method of dispersal of the funds, which specifically refutes respondent's claim that Mr. Suri was directing respondent on how to disburse the funds. With this evidence before it, the hearing court's finding of the existence of an escrow agreement was supported by sufficient evidence and was not clearly erroneous. This Court overrules this exception and accepts the hearing court's findings.

### C. Respondent's Legal Exceptions

#### 1. Procedural Error

Respondent excepts to the petitioner's Petition for Disciplinary Action and this Court's subsequent order, both of which were filed pursuant to Md. Rule 16–709. Respondent contends that the use of the "new Rules under Chapter 700 becoming effective on July 1, 2001 and replacing the Rules previously existing," was required. Respondent points to the fact that petitioner's petition was filed on November 1, 2001, after the July 1, 2001 effective date. Thus he claims that the petition, and any subsequent order by this Court, had no power because the rules used were no longer applicable. This contention has no merit.

This disciplinary proceeding was initiated well before the newer rules became effective on July 1, 2001; respondent overlooks this fact.[11] Mr. Lobo's complaint was docketed after receipt of his letter by Bar Counsel during March of 1998. After a thorough investigation, the matter was forwarded to an Inquiry Panel. A hearing took place on July 25, 2000, at which respondent did not appear. Regardless of the fact that it found that respondent had adequate notice of that Inquiry Panel hearing, the Review Board, on December 13, 2000, remanded the matter to the Inquiry Panel for a new hearing on the merits in order to safeguard against any argument that respondent's due process rights were adversely affected. That hearing occurred on February 28, 2001 and the matter was subsequently forwarded to the Review Board to file charges. The fact that these procedures all occurred before July 1, 2001 illustrates that respondent's disciplinary proceeding had been docketed, investigated, submitted to the Inquiry Panel and forwarded to the Review Board well before the rules changing this procedure went into effect. This disciplinary proceeding was correctly in the system pursuant to the rules in place at that time. As a result, all orders, filings, hearings and decisions made after July 1, 2001, including the Review Board's July 11, 2001 direction for Bar Counsel to file charges, petitioner's November 1, 2001 Petition for Disciplinary Action, the March 2002 hearing before Judge Stevenson, Judge Stevenson's July 22, 2002 findings and this Court's orders and this decision, were all correctly submitted and processed, as required, under the Maryland Rules.

## 2. Due Process

Respondent argues that his due process rights were violated by not being able to cross-examine the complainant,

---

11. In our order adopting the new rules, we specifically "ORDERED ... [T]hat any matter pending before an inquiry panel, The Review Board or the Court of Appeals pursuant to charges, a petition or an application pending as of June 30, 2001 shall continue to be governed by the Rules in effect on June 30 2001;" Md. Rules Orders pg 56, Maryland Rules of Procedure, vol. 1, (2002).

Mr. Lobo, in a courtroom within the jurisdiction of Maryland. This exception has no merit. We hold that respondent received adequate notice for all hearings and proceedings associated with this matter. On March 6, 2002, respondent also participated in the video-conference and taping of Mr. Lobo's deposition. Respondent and petitioner were located in Maryland, while Mr. Lobo was located in Australia. In fact, respondent was able to conduct a broad cross examination of the witness at that time. The fact that Mr. Lobo, and other witnesses subpoenaed by respondent, were beyond the subpoena power of this State does not violate respondent's due process rights. Again, after a thorough review of the record, we hold that respondent received sufficient notice throughout this disciplinary proceeding, all decisions were proved by clear and convincing evidence [12] and the proceeding was fair and consistent with all of respondent's constitutional rights.

### 3. Admissibility of Deposition Testimony

■ Respondent excepts to the hearing court's admission of Mr. Lobo's deposition testimony pursuant to Md. Rule 2–419(a)(3)(D).[13] We overrule this exception, as the deposition was properly admitted under Rule 2–419(a)(3)(D). That rule states:

"**Rule 2–419. Deposition—Use.**

(a) **When may be used.**

. . .

(3) Witness not available or exceptional circumstances. The deposition of a witness, whether or not a party, may be used by any party for any purpose against any other party who

---

**12.** We will specifically discuss, *infra*, the evidence supporting the hearing court's conclusions of law for each violation.

**13.** Respondent's submissions to this Court actually excepts to the hearing court's use of "Rule 2–419(a)(3)(C)" to admit Mr. Lobo's deposition. This is incorrect, as the hearing court in fact admitted the videotaped deposition under Rule 2–419(a)(3)(D). Despite the respondent's exception to the incorrect rule, this Court will discuss the hearing court's ruling under Rule 2–419(a)(3)(D).

was present or represented at the taking of the deposition or who had due notice thereof, if the court finds:

. . ..

(D) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena."

Respondent argues that the hearing court's admission of Mr. Lobo's videotaped deposition under Rule 2–419(a)(3)(D) was improper because "Mr. Lobo was available to come to the hearing but arbitrarily refused to do so."

In a very recent case, *Attorney Grievance Comm'n v. Snyder,* 368 Md. 242, 793 A.2d 515 (2002), which concerned a different rule, Md. Rule 5–804(a), we addressed the unavailability of witnesses in the context of testimony taken at the inquiry panel stage. We said:

"At the time of the hearing in the Circuit Court for Montgomery County, Royer no longer lived in Maryland and was not subject to subpoena. Furthermore, efforts by Bar Counsel to contact Royer by telephone and mail to procure his appearance at the hearing before Judge Woodward proved unsuccessful. Royer was absent at the hearing in the Circuit Court for Montgomery County and his presence could not be procured by process. Thus, respondent's exception to the admission in evidence of Royer's inquiry panel testimony is overruled." *Id.* at 265, 793 A.2d at 528. [Citations omitted.]

In overruling this exception in *Snyder,* we relied, in part, on our decision in *Bartell v. Bartell,* 278 Md. 12, 357 A.2d 343 (1976), where we upheld a trial court's exclusion of a party's attempt to admit his own deposition testimony in a divorce/custody action. In that case, Mrs. Bartell filed a complaint against her husband, Dr. Bartell, who voluntarily left Maryland and took up residence in Alberta, Canada. Mrs. Bartell charged her husband with adultery and desertion and sought permanent alimony, alimony *pendente lite,* custody of their children, child support and attorney's fees. Dr. Bartell sought to admit his own deposition, taken in Canada, at trial. This Court upheld the deposition's exclusion saying that it was

"[Dr. Bartell] and he alone who was responsible for his absence from the State and from the trial court." *Id.* at 24, 357 A.2d at 349. We also noted that Mrs. Bartell was powerless to compel her husband to testify at trial because "the subpoena powers of the State of Maryland stop at the state line." *Id.* at 19, 357 A.2d at 347. In this case, petitioner had no bearing on Mr. Lobo's absence from respondent's March 2002 hearing. Unlike Dr. Bartell, Mr. Lobo was never within the jurisdiction of this State and petitioner, the party seeking to admit Mr. Lobo's deposition, had no role in keeping Mr. Lobo beyond the reach of Maryland's subpoena power. Petitioner was "unable to procure the attendance of the witness by subpoena."

In a case involving a predecessor to the rule at issue in the case *sub judice, Perlin Packing Co. v. Price,* 247 Md. 475, 490, 231 A.2d 702, 711 (1967), we said:

"There was no evidence that the absence from the state of the witness Jerry Price was procured by any connivance on the plaintiffs' part and we think the trial judge properly allowed its [a deposition] admission into evidence."

In the older case, *Wilmer v. Placide,* 137 Md. 107, 109, 111 A. 822, 823 (1920), where we upheld the denial of admission of a deposition because evidence supporting its admissibility was lacking, we nonetheless said:

"We do not find in the record any statement that the witness was dead, or proof of his inability to attend. In *Baltimore Consolidated Ry. Co. v. O'Dea,* 91 Md. 506, 46 A. 1000, this section (which was § 19 of the Code of 1888) was before the Court. Chief Judge McSherry on pages 512–513 said of it: 'Primarily the statute contemplates that the resident witness shall appear in person, but as contingencies might occur where this would not be possible, the Legislature provide by § 19 for the production of his testimony by deposition if the personal attendance of the witness could not be procured in a reasonable time. The deposition thus taken can only be used should the witness continue unable to be present.' "

In *Kishter v. Seven Courts Community Association, Inc.*, 96 Md.App. 636, 626 A.2d 993 (1993), the Court of Special Appeals reversed a trial court's decision excluding deposition testimony where the witness was out-of-state pursuant to Md. Rule 2–419. In that case, the court said:

"In considering the draftsman's role, the trial court can and should consider the deposition testimony of the draftsman, if offered by appellants and if the draftsman is still located out-of-state. We note that at the initial trial appellants offered as an exhibit the transcript of a deposition of the draftsman, Richard Sokolov ... pursuant to Md. Rule 2–419. The deposition was taken in Ohio, where Sokolov lived and practiced. Counsel for the Association attended the deposition and cross-examined Sokolov. At the time of trial Sokolov was unavailable to appear as a witness. The trial court, however, refused to admit the Sokolov deposition. . . .

"Under Md. Rule 2–419(a)(3), a deposition in lieu of live testimony is admissible when the deponent/witness is unavailable to testify at trial and the party against whom the deposition is being used was present at the deposition or at least had notice of it. *Shives v. Furst*, 70 Md.App. 328, 521 A.2d 332 (1987). In the present case the deponent/witness was outside of the State and therefore unavailable as a witness. The Association was present at the deposition and, in fact, availed itself of the opportunity to cross examine the deponent. Accordingly, the deposition should have been admitted into evidence."

*Id.* at 643–44, 626 A.2d at 997. In an earlier case analyzing a predecessor rule to Md. Rule 2–419, which contained nearly identical language, the Court of Special Appeals held that "[w]ithin the clear contemplation of the rule is the fairly routine situation wherein a witness has been deposed and is then, for some reason, unable to attend the trial." *Quecedo v. DeVries*, 22 Md.App. 58, 62, 321 A.2d 785, 787, *cert. denied*, 272 Md. 747 (1974). The facts in the case *sub judice* are essentially the same. Not only was Mr. Lobo out of the State of Maryland, he, as far as this Court can ascertain, was never

inside the United States and could not legally have been in the country during respondent's entire disciplinary proceeding because respondent had failed to procure a visa for him. Mr. Lobo failed to answer the respondent's subpoena to attend his March 26–27, 2002 hearing. Mr. Lobo has not been able to obtain a visa to enter the United States since 1996. Mr. Lobo was unavailable.

Similar to the Seven Courts Community Association in *Kishter*, respondent was present and able to cross examine the witness at the deposition.[14] In addition, the hearing court was able to assess Mr. Lobo's physical demeanor and many other aspects of live testimony due to the fact that his deposition was videotaped. Respondent was able to cross examine Mr. Lobo and the hearing court was able to see Mr. Lobo's facial expressions, mannerisms and testimony via the videotaped deposition, and thus was able to assess Mr. Lobo's credibility. The videotaped deposition was correctly admitted into evidence pursuant to Md. Rule 2–419(a)(3)(D).[15]

---

**14.** Respondent and petitioner were not physically present in Australia when Mr. Lobo was deposed on March 6, 2002. Respondent and petitioner conducted their examinations of him via video-conference.

**15.** It is clear to this Court, that these facts and similar reasoning suggest, that Mr. Lobo's deposition would have also been properly admitted pursuant to Rule 2–419(a)(3)(B). That rule states:
> "**Rule 2–419. Deposition—Use.**
> (a) **When may be used.** . . .
>
> (3) Witness not available or exceptional circumstances. The deposition of a witness, whether or not a party, may be used by any party for
> any purpose against any other party who was present or represented at the
> taking of the deposition or who had due notice thereof, if the court finds: . . .
>
> (B) that the witness is out of the State, unless it appears that the absence of the witness was procured by the party offering the deposition.

In the case *sub judice*, Mr. Lobo resides and is located in Australia, which is clearly outside the jurisdiction of the State of Maryland and he is unwilling to come to the United States to testify in this case. In fact, this case arises out of respondent's failure to return money to Mr. Lobo after Mr. Lobo could not obtain entry into the United States. As such,

#### 4. Clear and Convincing Evidence

■ Respondent generally excepts to the hearing court's conclusions that petitioner presented evidence sufficient, by a clear and convincing evidence standard, to find respondent's conduct in violation of the charges set out in petitioner's petition. We recently reiterated the definition of clear and convincing evidence in *Harris,* 366 Md. at 389, 784 A.2d at 523–24 (quoting *Mooney,* 359 Md. at 79, 753 A.2d at 29), when we said:

> " 'The requirement of "clear and convincing" or "satisfactory" evidence does not call for "unanswerable" or "conclusive" evidence. The quality of proof, to be clear and convincing, has also been said to be somewhere between the rule in ordinary civil cases and the requirement of criminal procedure—that is, it must be more than a mere preponderance but not beyond a reasonable doubt. It has also been said that the term "clear and convincing" evidence means that the witnesses to a fact must be found to be credible, and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order, so as to enable the trier of the facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. Whether evidence is clear and convincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence.' " [Some citations omitted.]

We hold that Judge Stevenson's conclusions of law meet this burden. After an extensive review of the record in the case *sub judice,* we overrule respondent's exception and hold that the hearing court's conclusions of law are supported by sufficient facts, which meet the clear and convincing standard.

#### a. Misappropriation of Client Funds

The hearing court specifically found that respondent misappropriated the funds of his clients, Mr. Damani and Mr. Lobo.

---

Mr. Lobo's absence from respondent's hearing was not procured by petitioner, who offered the deposition.

As such, the court concluded that respondent's misappropriations, comprehensively set out by the hearing court, constituted violations of Md. Rule 16–609 and section 10–306 of the Business Occupations and Professions Article of the Maryland Code. As earlier indicated, Rule 16–609 states:

**"Prohibited transactions.**

An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer."

Section 10–306 states:

**"Misuse of trust money.**

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

After March 4, 1996, when respondent established the Escrow Account for Mr. Lobo, he intentionally and consistently depleted the funds of said account without the permission of Mr. Lobo. Nearly every disbursal was directly to respondent himself, with the exception of the funds wired to Anglo American in England.[16] Even after Mr. Lobo demanded the return of the $30,000, evidencing his lack of knowledge of respondent's account activity, respondent continued to disburse funds to himself. Regardless of whether Mr. Lobo owed respondent a fee, he still misappropriated thousands of Mr. Lobo's dollars. His use of Mr. Lobo's money was inconsistent with their escrow agreement and occurred without Mr. Lobo's knowledge.

In addition, respondent received $26,000 from a Mr. Damani in 1997. Again, the money was received into respondent's

---

**16.** Although these funds were not disbursed to himself, they were disbursed in furtherance of obtaining funding for IBS, a company whose officers included respondent and his wife.

Attorney Account and was to be held in trust by respondent. Although respondent did return the entire amount to Mr. Damani, he failed to maintain the funds in trust. Respondent's bank records clearly show that respondent's account balance fell below $26,000 several times during the time in which those funds were to be held in trust. In fact, respondent was only able to repay the funds after transferring over $25,000 from his various other accounts. Respondent's handling of Mr. Lobo's and Mr. Damani's accounts is conduct that clearly illustrates a misappropriation in that respondent was using his clients' money for his own personal needs. This was inconsistent with their wishes, constituting an improper purpose in violation of Md. Rule 16–609 and section 10–306 of the Business Occupations and Professions Article of the Maryland Code. We thus overrule respondent's exception.

### b. Commingling of Funds and Maintenance of Accounts

In her conclusions of law, Judge Stevenson found that respondent did not maintain his client trust accounts properly and additionally commingled Mr. Lobo's $30,000 and Mr. Damani's $26,000, with respondent's own funds in violation of MRPC 1.15(a), Title 16 Section 600 of the Maryland Rules and section 10–302 of the Business Occupations and Professions Article of the Maryland Code. The relevant portions of MRPC 1.15 state:

"(a) A lawyer shall hold property of clients ... that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. . . . Complete records of such account funds ... shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds ... in which a client ... has an interest, a lawyer shall promptly notify the client. . . . [A] lawyer shall promptly deliver to the client ... any funds ... that the client ... is entitled to receive and, upon request

by the client . . . shall promptly render a full accounting regarding such property."

On March 1, 1996, Mr. Lobo sent $30,000 to respondent's Attorney Account. While respondent claims that he did not immediately transfer this money to an escrow account because it was received late in the day on Friday, March 1, 1996, it is clear that he was able to disburse some of those funds prior to establishing the Escrow Account. These disbursements were not attorney's fees but were found to have been for the purpose of obtaining financing for respondent's personal interests. In the representation of another client, respondent received $26,000 from a Mr. Damani in 1997. That money was not a payment of fees; it was money to be held in trust by respondent. However, instead of depositing those funds into a trust or escrow account, respondent deposited them into his Attorney Account. As previously mentioned, he allowed the balance to drop below the trusted amount several times. Under MRPC 1.15(a) and Md. Rule 16–607, this type of commingling of client and lawyer funds is clearly prohibited.

This conduct is also violative, as the hearing court found, of section 10–302 of the Business Occupations and Professions Article of the Maryland Code. That statute denies a lawyer the right to accept trust money unless that lawyer properly maintains an attorney trust account complying with the Maryland Rules, specifically, for the purposes of this case, sections 603, 604 and 607 of Title 16. As earlier noted, the relevant portions of these sections of Title 16 provide:

"**Rule 16–603. Duty to maintain account.**

An attorney . . . shall maintain one or more attorney trust accounts for the deposit of funds received from any source for intended benefit of clients or third persons. The account or accounts shall be maintained in this State, in the District of Columbia, or in a state contiguous to this State, and shall be with an approved financial institution. Unless an attorney maintains such an account . . . an attorney may not receive and accept funds as an attorney from any source intended in whole or in part for the benefit of a client. . . .

**"Rule 16–604. Trust account—Required deposits.**

Except as otherwise permitted by rule or other law, all funds . . . received and accepted by an attorney . . . in this State from a client . . . to be delivered in whole or in part to a client . . . unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution.

. . .

**"Rule 16–607. Commingling of funds.**

a. **General prohibition.** An attorney . . . may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule." [17]

In the case *sub judice,* respondent accepted Mr. Lobo's trust money, which was intended to benefit Mr. Lobo, not respondent, by wire into his Attorney Account on March 1, 1996. Only later, on March 4, 1996, did he open the Escrow Account for Mr. Lobo. Prior to even opening the Escrow Account, respondent wired two money transfers to England, which totaled $6,360 of Mr. Lobo's $30,000 and was wired from respondent's Attorney Account. By depositing trust funds into his Attorney Account, respondent violated Md. Rule 16–606, which requires the title of a trust fund account to include the words, "Attorney Trust Account," "Attorney Escrow Account" or "Clients' Funds Account," which shall be on all checks and deposit slips. Because respondent commingled his own funds with that of trust funds in his personal Attorney Account, he failed to maintain an account in accordance with Md. Rule 16–607. As a result of this conduct, which was in total disregard for Title 16 Section 600 of the Maryland Rules, respondent violated section 10–302 of the Business Occupations and Professions Article of the Maryland Code.

---

**17.** The exceptions to this rule are noted *supra.* They are not included in this part of the discussion, as none of them are relevant to respondent's conduct.

Respondent subsequently failed to maintain and provide Mr. Lobo with adequate records of his accounting of the disbursements of the $30,000 and additionally failed, under MRPC 1.4(a), to keep Mr. Lobo aware of the disbursements at all. Rule 1.4 states, in relevant part: "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information."

This case is replete with facts showing that respondent not only mishandled Mr. Lobo's Escrow Account, but failed to keep Mr. Lobo aware of the activity on the account. Respondent did not keep any records, nor did he supply records to Mr. Lobo. Respondent represented that his partner and non-lawyer, Mr. Suri, had kept all the records pertaining to Mr, Lobo's Escrow Account. However, a comparison of Mr. Suri's records with that of respondent's bank records shows significant differences, including a substantial difference in the amount of money to be returned to Mr. Lobo. Mr. Lobo's requests for a full refund illustrate respondent's failure to inform his client of disbursements. The record provides clear and convincing evidence that respondent violated MRPC 1.4(a).

### c. Attorney Misconduct

Respondent also excepts to the hearing court's conclusions that respondent was in violation of MRPC 8.4(a), (b), (c) and (d). We overrule these exceptions. A criminal conviction is not a prerequisite for finding a violation of Rule 8.4 and conduct prejudicial to the administration of justice. *See Attorney Grievance Comm'n v. Childress*, 360 Md. 373, 385, 758 A.2d 117, 123 (2000) ("It is also clear that a criminal conviction is not a condition precedent for disciplinary proceedings."); *Attorney Grievance Comm'n v. Breschi*, 340 Md. 590, 600, 667 A.2d 659, 664 (1995). All that is required is clear and convincing evidence of conduct that constitutes the commission of the offense or prejudice to the administration of justice. *Attorney Grievance Comm'n v. Proctor*, 309 Md. 412, 524 A.2d 773 (1987). As we have held that respondent has violated several Rules of Professional Conduct, he necessarily violated MRPC

8.4(a) as well, which finds professional misconduct where a lawyer "violate[s] or attempt[s] to violate the Rules of Professional Conduct."

MRPC 8.4(b) is violated when a lawyer "commit[s] a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." This Court has previously found violations of this rule when an attorney misappropriates money. *See Attorney Grievance Comm'n v. Vlahos*, 369 Md. 183, 186, 798 A.2d 555, 556–57 (2002); *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 381, 773 A.2d 463, 466 (2001); *Attorney Grievance Comm'n v. Williams*, 335 Md. 458, 473–74, 644 A.2d 490, 497 (1994); *Attorney Grievance Comm'n v. White*, 328 Md. 412, 415–16, 614 A.2d 955, 957 (1992). Section 10–606 sets out the penalties for willful violations of handling of attorney trust accounts. That statute states:

**"Penalties.**

(b) *Attorney trust accounts.*—A person who willfully violates any provision of Subtitle 3, Part I of this title, except for the requirement that a lawyer deposit trust moneys in an attorney trust account for charitable purposes under § 10–303 of this title, is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both."

As the trial court had a sufficient factual basis to meet the clear and convincing evidence standard of proof to find as fact, that respondent committed these violations willfully, respondent's conduct is criminal in nature, as defined by section 10–606.

We hold that respondent's willful misappropriation of the funds of Mr. Lobo and Mr. Damani, violates Md. Rule 16–609 and section 10–306 of the Business Occupations and Professions Article of the Maryland Code, and is thus criminal conduct under section 10–606 of the Business Occupations and Professions Article of the Maryland Code. We hold that this blatant misappropriation of client funds, respondent's inability to abide by his written escrow agreement with Mr. Lobo and

respondent's use of Mr. Lobo's funds for personal gain constitutes a gross violation of MRPC 8.4(b), thus necessarily having severe adverse effects on respondent's honesty and trustworthiness in other respects, as well.

 This Court has consistently found misappropriation of client funds and deceit to constitute a violation of MRPC 8.4(c). *See Vlahos*, 369 Md. at 186, 798 A.2d at 556–57; *Snyder*, 368 Md. at 260, 793 A.2d at 525–26; *Vanderlinde*, 364 Md. at 381, 773 A.2d at 466; *Attorney Grievance Comm'n v. Bernstein*, 363 Md. 208, 768 A.2d 607 (2001); *Attorney Grievance Comm'n v. Tomaino*, 362 Md. at 486, 765 A.2d at 655 (2001); *Attorney Grievance Comm'n v. Sheridan*, 357 Md. 1, 24–26, 741 A.2d 1143, 1156–57 (1999); *Attorney Grievance Comm'n v. Sabghir*, 350 Md. 67, 710 A.2d 926 (1998); *Attorney Grievance Comm'n v. Hollis*, 347 Md. 547, 702 A.2d 223 (1997); *Williams*, 335 Md. at 473–74, 644 A.2d at 497; *White*, 328 Md. at 415–16, 614 A.2d at 957. Respondent's conduct was dishonest and deceitful in that he led Mr. Lobo to believe that Mr. Lobo's $30,000 would be held in trust and returned to him in full, subject to their agreement, while he later disbursed that money without Mr. Lobo's knowledge or consent. Respondent also made misrepresentations about his authority to distribute this account's funds to petitioner. Additionally, respondent misled Mr. Damani when respondent indicated that Mr. Damani's money would be held in trust.[18]

---

18. In addition to the facts already stated, Judge Stevenson based her conclusion that respondent violated MRPC 8.4(c), in part, on her findings that respondent had misrepresented to Mr. Lobo that respondent had been successful in obtaining a L–1 Visa for Mr. Lobo. While petitioner's expert, Laurence Johnson, supplied ample evidence to support the court's findings, this Court does not reach the question of whether the Visa Approval condition of respondent's agreement with Mr. Lobo was satisfied. It is irrelevant to this disciplinary proceeding because there was sufficient evidence for the hearing court to find respondent in violation of these rules without making this determination, which would be an interpretation of Federal, not Maryland, law. In regard to MRPC 8.4(c), there is sufficient evidence to support a finding that respondent violated this rule without answering that question.

This Court has also found conduct constituting the misappropriation of client or third party funds to be "prejudicial to the administration of justice" in violation of Rule 8.4(d). *See Snyder*, 368 Md. at 260, 793 A.2d at 525–26; *Hollis*, 347 Md. 547, 702 A.2d 223; *White*, 328 Md. at 415–16, 614 A.2d at 957. In the case *sub judice*, we hold that respondent's conduct in the handling of his clients' trust accounts was directly harmful to the legal profession.

This Court has said in *Attorney Grievance Comm'n v. Clark*, 363 Md. 169, 183, 767 A.2d 865, 873 (2001), that "[p]ublic confidence in the legal profession is a critical facet to the proper administration of justice." If this Court were not to sanction respondent severely, other lawyers would not receive appropriate guidance regarding the standards to which all should be held and public confidence in the legal profession might be greatly diminished. As such and in line with precedent, we hold that respondent violated MRPC 8.4(d) by engaging in conduct that was prejudicial to the administration of justice.

### III. Sanction

We now consider the appropriate sanction for respondent's misconduct. In the case *sub judice*, the Attorney Grievance Commission, through Bar Counsel, argues that disbarment is appropriate, while respondent advocates that he has not violated any of the rules, and proffers that he should not be sanctioned at all. In *Clark*, we set out the purposes behind and the factors to be considered in our sanctioning process when we stated:

"This Court is mindful that the purpose of the sanctions is to protect the public, to deter other lawyers from engaging

---

Additionally, the escrow agreement stated that "non-performance on project funding and or inability to obtain L–1 Visa approval for Mr. Phillip A. Lobo" would result in a return of the entire $30,000 to Mr. Lobo. Finally, even if respondent deserved some fee, it certainly did not come close to totaling $30,000; as such, respondent necessarily misappropriated a large portion, if not all, of Mr. Lobo's $30,000.

in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession. *See Attorney Grievance Comm'n of Maryland v. Hess,* 352 Md. 438, 453, 722 A.2d 905, 913 (1999) (*quoting Attorney Grievance Comm'n v. Webster,* 348 Md. 662, 678, 705 A.2d 1135, 1143 (1998)). We have stated that '[t]he public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed.' *Attorney Grievance Comm'n of Maryland v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997). Therefore, the appropriate sanction depends upon the facts and circumstances of each particular case, including consideration of any mitigating factors. *See Attorney Grievance Comm'n of Maryland v. Atkinson,* 357 Md. 646, 656, 745 A.2d 1086, 1092 (2000); *Attorney Grievance Comm'n of Maryland v. Gavin,* 350 Md. 176, 197–98, 711 A.2d 193, 204 (1998)."

*Clark,* 363 Md. at 183–84, 767 A.2d at 873. In addition, we have stated that "[i]mposing a sanction protects the public interest 'because it demonstrates to members of the legal profession the type of conduct which will not be tolerated.' " *Attorney Grievance Comm'n v. Mooney,* 359 Md. 56, 96, 753 A.2d 17, 38 (2000) (quoting *Attorney Grievance Comm'n v. Ober,* 350 Md. 616, 631–32, 714 A.2d 856, 864 (1998)) (citation omitted).

In this case, we have upheld the hearing court's findings, by clear and convincing evidence, that respondent violated several rules of professional conduct, including misappropriation of client funds under Md. Rules 16–603, 16–604, 16–606, 16–607 and 16–609, sections 10–302 and 10–306 of the Business Occupations and Professions Article of the Maryland Code, and MRPC 1.15, failing to keep a client reasonably informed under MRPC 1.4(a), and committing professional misconduct under MRPC 8.4(a), (b), (c) and (d). The hearing court's findings and conclusions show that respondent acted willfully and intentionally in his depletion of Mr. Lobo's $30,000, which was supposed to be held in the Escrow Account and later returned to Mr. Lobo. The facts indicate that

respondent has made continuous misrepresentations throughout these proceedings. Respondent submitted no mitigating evidence and the record does not reflect any extenuating circumstances.

In light of these findings, respondent's numerous violations, his egregious conduct and this Court's consistent practice of disbarment of lawyers who misappropriate client funds absent mitigation or extenuating circumstances, we hold that the appropriate sanction for respondent's conduct is disbarment. *See Attorney Grievance Comm'n v. Sullivan,* 369 Md. 650, 801 A.2d 1077 (2002) (disbarring attorney for theft of estate funds while serving as personal representative); *Attorney Grievance Comm'n v. Powell,* 369 Md. 462, 800 A.2d 782 (2002) (disbarring attorney for commingling trust funds with his own personal funds to intentionally hide assets from creditors); *Vlahos,* 369 Md. at 186, 798 A.2d at 556 ("It has long been the rule in this State that absent compelling extenuating circumstances, misappropriation by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment"); *Snyder,* 368 Md. at 276, 793 A.2d at 535 (holding that a lawyer's "dishonest and deceitful conduct with regard to the misuse of his client escrow account alone would be sufficient to warrant . . . disbarment"); *Vanderlinde,* 364 Md. at 413–14, 773 A.2d at 485 (stating that the Court will disbar an attorney for misappropriation, and the like, unless " 'compelling extenuating circumstances,' anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the 'root cause' of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC"); *Bernstein,* 363 Md. at 226–30, 768 A.2d at 617–19 (holding that disbarment is appropriate for an attorney's misappropriation of funds); *Tomaino,* 362 Md. at 498, 765 A.2d at 661 (recently reaffirming this Court's precedent that misappropriation is inherently deceitful, thus requiring disbarment); *Sheridan,* 357 Md. at 27, 35, 741 A.2d at 1157, 1161–62 (indefinitely suspending attorney who misappropriated funds where significant mitigatory facts were present); *Sabghir,* 350

Md. at 84, 710 A.2d at 934 (disbarring attorney for misappropriation and fraud relating to money); *Hollis*, 347 Md. at 560, 702 A.2d at 230 (disbarring attorney for misappropriating over $80,000); *Attorney Grievance Comm'n v. Kenney*, 339 Md. 578, 587, 664 A.2d 854, 858 (1995) (indefinitely suspending, instead of disbarring, attorney for misappropriation because of mitigatory factors); *Williams*, 335 Md. at 474, 644 A.2d at 497–98 (disbarring attorney for violating several rules and emphasizing that the misappropriation of client funds was the most egregious violation); *White*, 328 Md. at 421, 614 A.2d at 960 (disbarring attorney who misappropriated over $14,000 of client's money); *Attorney Grievance Comm'n v. Bakas*, 323 Md. 395, 403, 593 A.2d 1087, 1091 (1991) (indefinitely suspending, instead of disbarring, attorney for misappropriation because of mitigating factors); and *Attorney Grievance Comm'n v. Ezrin*, 312 Md. 603, 608–09, 541 A.2d 966, 969 (1988) (disbarring attorney for embezzling over $200,000 from his firm).

Accordingly, we shall disbar respondent.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST EDWARD PATRICK GALLAGHER.**